Good morning, Your Honors. I'm Steve Saxton for Tehama-Colusa Canal Authority. The appellant and with me is my colleague, Ellen Trescot. We're here, as the Court is aware, to ask the Court to reverse the District Court's judgment and grant summary judgment in favor of TCCA, Tehama-Colusa Canal Authority, on the grounds that the Bureau of Reclamation has distributed Central Valley Project water in violation of Section 11460, the State's Area of Origin Protection statute. Has the California Supreme Court ever definitively interpreted 11460? It has not, Your Honor. You've got Attorney General. We do. And that's it. Okay. Do you think that maybe this is a case that would be right for certification so that the High Court of California can resolve the issue? Your Honor, I've taken a look at this Court's most recent decision on that case, which I believe is the Beeman case, and I think this situation is distinguishable from that. Here we do have a definitive articulation of the meaning of 11460 in the State Water Resources Control Board case's decision, the so-called Robey decision, named after its author. In that case, there was a petition for review to the California Supreme Court following the Robey decision, and that petition was denied. In addition to that, the current Chief Justice of the California Supreme Court was one of the panelists in the Robey decision and concurred in the decision. And for what it's worth, I'll offer it to that extent. Justice Robey has never been reversed on a water rights decision. Do you think he has definitively resolved this issue in his decision? For purposes of the meaning of the statute, Your Honor, I'm confident that Justice Robey's articulation of the meaning of the statute is clear, definitive. He made a deliberate decision, to use the words of this Court's decision in United States v. Johnson, to resolve the issue. And there's really no ambiguity or doubt about what he had in mind when he articulated that meaning. And how does that then filter into this case, and what does it demand? I would submit, Your Honor, that it demands that this Court follow the Robey decision under Lewis v. Telephone Employees Credit Union. That case stands for the proposition, along with lots of other similar cases, that where there is absolutely no evidence, as is the case here, that the State's Supreme Court would rule differently, would decide the meaning of the Area of Origin Protection statute any differently than did the Third District Court of Appeal, then this Court should follow that reasoning and that decision. Counsel, what effect, if any, do you think the validation of the contracts with the provisions that do not have the allocations that you prefer, what effect does that have on how we should decide this case? Your Honor, in all candor, that argument is confusing and misleading. It was only brought by Westlands, the party, the intervening party that represents the San Joaquin Valley interests. Reclamation does not contend that the validation of the contracts has any bearing on this case at all. Did the district court consider that to be a pertinent occurrence? The district court adopted the Westlands' reasoning, I'm tempted to say hook, line, and sinker. But the point of the validation is to determine whether there are any invalid provisions in the contract, and the only reason that the validation would conclusively determine issues that cannot now be raised is if TCCA were seeking to invalidate that which the validation judgment validated, and that's not the case here. Westlands, Your Honor, has changed its argument. In the court below, and this is perhaps explains the resulting decision of the district court, in the court below, Westlands was saying TCCA is now seeking to invalidate the shortage provisions in the contract. That's not true. No, I was thinking about something different. I was thinking about the intent of the parties who contracted. It would seem to me if someone had that issue about the allocation of the water and the contract did not address that point, that the contract wouldn't be validated or executed until that point was addressed and favorable terms were included. That's kind of how I was thinking about the validation portion of the case. And I – and that's a good question. Strictly speaking, the response to it is the one I just gave, which is if a provision – if we're not seeking to invalidate a provision that was validated, that's the end of the inquiry for purposes of the statute. Well, what does that say about the intent of the parties and what they meant in allocating the water? Well, the shortage provisions, particularly as expressed in Article 12 of the contract, say nothing about whether the statute applies or not. It's a general provision that allows a lot of flexibility. It's very general, but that doesn't make it ambiguous. And therefore, on one level, the intent of the parties is irrelevant because there's no ambiguity in the provision of the contract. But what the – what the argument about validation boils down to is that TCCA, during the validation action, should have – should have asked the judge to require reclamation to include a provision in the contract that specified that Section 11-460 applies to the contract. Now – If the contract would otherwise be legal, because your argument is that – your argument is that performance under the contract violates California law. So if that is the case, isn't that your argument? It's not consistent with California law? The argument is that the contract is completely consistent with reclamation's ability to perform the contract under California law. And – and reclamation has failed to do so. It has failed to implement the terms of the contract in accordance with the requirements of California law and in terms of Section 11-460. That's saying it another way, that the contract is being implemented in violation of California law. Basically, that's your argument. So my question is, if all of the parties knew that going in, because there was no secret as to what the Bureau's position was on this point, why wouldn't that issue have been raised in the validation so that it could have been sorted out in State court? Well, that's not, strictly speaking, what validation actions do, Your Honor. Validation actions ask if there's any irregularity in the proceedings or if there's any illegality in any of the provisions of the contract. That wasn't the case, and the issue wasn't raised. There was a – It would seem to me that an attorney who's representing an agency that thinks that the Bureau is not acting in accordance with California law would find it appropriate to bring that up in the validation. I don't understand why that wouldn't be brought up in the validation sect – validation proceeding if it's in fact of such critical import. That escapes me. At the time these contracts were validated, Your Honor, this issue was pending before it had just finished being considered by the State superior court, and it was on appeal to the – to the Third District Court of Appeals. At that time, all of the parties understood that their interpretation of Section 11-460 might be right, might be wrong, but the issue was going to be decided. Now, in the context of the validation proceeding, there was no question about the provisions of the contract, Your Honor. There has never been any discussion about the legality or illegality of the provisions of the contract. It has always been TCCA's position that this contract is – is consistent with applying the area of origin statute and that it is mandatory on the Bureau's part to comply with the area of origin statute. And the Bureau's understanding has been exactly the opposite, right? The Bureau's understanding has been – and once again, it's important to decouple the provisions of the contract, which were, frankly, never discussed in the negotiations, the shortage provisions. The question has always been, what does this statute mean, how does it apply? That was the question that the Tehama-Pelluca contractors raised in 1990 when they first protested shortages under the interim contract. That was the question that was preserved in a separate 2002 contract among Westlands, the Bureau, and Tehama-Pelluca Canal Authority to preserve TCCA's position on the meaning of the statute. And the Bureau has preserved its position as well, right? It has, indeed, and that's why we are here. Let me – let me see if you can answer this. In the red brief dealing mostly at page 18, it says, Section 11-460 instructs that areas of origin are not to be deprived of a prior right but observe that the provision does not identify how that prior right is to be established or protected. TCCA members must develop this prior right by complying with the general laws of the state, both substantively and procedurally, to apply for and perfect a water right through obtaining a state permit to appropriate water. It is undisputed, and here's where I'm going, that TCCA has never applied for and the State Board has never issued to any TCCA members appropriative or other water rights permits for Central Valley water. What's your answer to that? Which seems to me the primary thrust of their argument in the brief. It is the primary thrust of their argument. It didn't apply, so therefore you're just out. Exactly. That is exactly the argument that's being used. And your precise answer to that, I couldn't find one, a precise answer in your briefs. Tell me what it is. It is this. Starting with the Robey decision, the State Water Resources Control Board case's decision, there is nothing in the language of that statute that requires one to perfect its area of origin rights by going to the board and getting a permit. Indeed, the Central Valley Project was built so that people could get the water that they needed. Under what mechanism? Under the mechanism of the Central Valley Project. Your Honor, that was the point of the 1950 Canals Act, Sacramento Canals Act, that made possible the delivery of water from the Sacramento River at Red Bluff through the four counties on the west side of the valley that comprised TCCA's service area. The legislative history of the 1950 Canals Act says straightforwardly the purpose of this act and these facilities is to give physical effect to the area of origin priority enjoyed by those Sacramento contractors who are entitled to this water. But wouldn't that be pursuant to State law, though? That State law is the area of origin statute that confers a right to that water. But here's my problem with your position, is what procedure would be used, you know, to take advantage of the area of origin rights? I mean, do you just demand water from the Bureau? Do you just show up with a sign? No, you wait for Congress to enact legislation that authorizes the construction of facilities whose purpose is to fulfill your area of origin rights, which is precisely what the 1950 Canals Act is. This argument suggests that there is an application procedure, that it is open to your clients, that you could have and have not ever made such an application for these water rights permits. Could you apply? Could your clients have applied? If they could have, why didn't they? It seems that that would instantaneously defeat the government's argument and put you in line to then take advantage of this area of origin law, wouldn't it? Yes. There are two ways to obtain central valley water that is diverted and stored by the Central Valley Project. One is to go to the State Board, apply for a permit, as Your Honor has just indicated. Could your clients have done that? They could have done that. Did they do it? They did not do it. Go ahead. And I assume the Court is interested in the reason that they didn't do that, which is simply this. The Central Valley Project's purpose and the legislative history of the legislation that made that project possible is abundantly clear. So we don't need no stinking badges. You're exactly right. We don't need a permit. And there is nothing in the language of the statute itself that even suggests that. In fact, it says that we are entitled to a prior right. Prior does not mean some other right or some permit that you can get at a board. It means superior. It means preferred. It means prior. What's the downside, though, to doing that? I mean, here the other side is saying we're not doing this unless you file an application. And you're simply saying we don't have to. Well, they say, well, yeah, you don't have to, but if you do, maybe we'll play ball with you. I mean, has this become like Congress, as we heard before? It's just a fight between red and blue? No, Your Honor. In fact, why don't you make an application? And then you just override this whole thing, if they're right. Well, I won't belabor this. As a technical matter, that would run directly contrary to the legislative intent. Yeah, I know, but what's the practical downside for what your clients are trying to accomplish? If these contract holders, who now have a right to CVP supply by virtue of their contracts and Section 11460, if they went to the board, they would be then engaged in a protracted process that would take years. As protracted as this? Oh, this is nothing, Your Honor. This is patty cake compared to the delays before the State Board. And in addition to that ---- I'm not disputing you, but how do we know that? Just because ---- Everybody knows it, right? I can't ask you to take judicial notice of the fact that everything takes forever at the State Board, Your Honor, but I don't think I'd give an argument. For the record, we're holding your hands to the sky. Divine intervention. Your Honor, what would happen is there would be a protracted process. There's no guarantee of the outcome. In order to get a permit to appropriate water, you would have to demonstrate to the board that you have a place of diversion, that you have the means to divert the water, that you have the means to convey the water from the Sacramento River. In other words, this is an invitation for the TC contractors to get a permit and build their own projects. Now, of course, there is an alternative to that. There is an alternative to spending those millions and millions of dollars and all the time trying to prove up the requirements for a permit. That is to enter into a Warren Act contract with the Bureau to use the existing facilities. I'm sorry, I didn't miss that. A Warren Act contract? Warren Act. The reclamation is required under certain criteria to make conveyance facilities available to those who have a beneficial need for them. So best outcome, we would be right back where we are now. We would be using the same facilities that we're using now. We would have spent millions of dollars to get permits. We would have those permit applications undoubtedly protested by the same parties whose water supplies are perceived to be threatened by this very lawsuit. And we would have achieved nothing. What the outcome of that is for practical purposes in terms of the systems management is that instead of the Bureau having control by way of contracting over its supply, the accountability of that supply, the use of that supply, its ability to determine whether the supply is being put to reasonable and beneficial use as it does now, you would have, we would be curtailing the Bureau's diversions from the Sacramento River in order to satisfy our own. And the state board, in addition to the Bureau of Reclamation, would then be in charge of managing this water supply. And there would be even fewer limitations on the amount of supply that could be claimed because it would all be a question of what you could prove up to the board in terms of your needs. Why does it cost millions to get a permit? Is that legal fees or is that what? Legal fees, engineering fees, and what I'm referring to, and I can see this is hypothetical, but it's based on the experience of contractor, excuse me, of permittees before the board, in my experience at least. You've got to be able to prove that you've got a project that'll work. That means the design for the project, at least it has to be viable. And it means that before you're going to get the permit, you've got to build the project that's going to get you the water. So what are you asking this court to do? What orders are you looking for? We're looking for an order that reverses the district court's judgment, that enters summary judgment in favor of TCCA and requires reclamation to perform its contracts with TCCA in accordance with our interpretation, the State Water Resources Control Board case's interpretation of section 11-460. Let me ask you this. You have these contracts. Am I correct that in none of the contracts are there any priority provisions that are included in the contracts of reclamation? There are not in our contracts, no. Why not? Why didn't you, you know, seek to get priority provisions in the contracts? In 1994, during the negotiations for the interim renewal of the original contracts, Your Honor, we did seek such a provision. And we offered a compromise on the area of origin issue, which was to cap our shortages at 25 percent in exchange for a certain amount of flexibility in reclamation's ability to allocate during shortages. If we're not successful, does that suggest that there is no priority rights here? No. I would say no to that, Your Honor, because this is just another instance of reclamation refusing to abide by the requirements of section 11-460. And if we were to issue such an order and reclamation were to comply, what's the practical benefit for your clients from something like that? It's a good question, because the amount of water that's an issue in this case is really very small in the overall scheme of things and in the overall system. We would get, based on the shortages that were imposed on our clients in 2008 and 2009, something on the order of 6 percent restored to us of the amount that's under contract for export to the San Joaquin Valley. That's the difference between something on the order of 191,000 acre feet compared to 3.3 million acre feet that's under contract for export. All right. Thank you, counsel. You've exceeded your time. Thank you. We'll give you a minute for rebuttal. I appreciate it.  May it please the Court, my name is Vivian Wong, and I represent the Bureau of Reclamation. We will be sharing our time this morning with the interveners, who are represented by Mr. O'Hanlon. So if I may ask you the same question I asked your adversary, what is your position in terms of whether it might be provident to simply certify the 11-460 issue to the California Supreme Court? Your Honor, we don't believe that it's necessary to certify this question because there's no – there's not ambiguity in the language of 11-460. You don't seem to agree with your adversary in that respect, do you? I mean, this is the very epitome of ambiguity. Your positions are at variance with each other. Our position is different from that of Tehama Clos' that's correct. However, the majority of State authorities' interpretation of Section 11-460 comports with the interpretation of Reclamation. You think it clearly says one thing. He thinks it clearly says something else, right? Yes, Your Honor. But also, there are two court of appeal – California court of appeal cases, the Eldorado irrigation case as well as the Phelps case, both of which support Reclamation's interpretation of 11-460. I think it varies with the SWRCB cases. I mean, you know, I guess I'm puzzled. You know, we have a lot of water in Brooklyn because we had Hurricane Sandy. I guess if we had Hurricane Sandy here, we would not have to be dealing with these cases. But, you know, we don't get cases like this in Brooklyn, so I'm just trying to educate myself. Maybe you can help me. I'm a little confused about how you sort of harmonize the SWRCB cases with the Eldorado cases and the esteemed Justice Roby's taking both those cases. Well, that's correct, Your Honor. As you did observe, as an initial matter, I think it's worth noting that Judge Roby, who did decide who authored the SWRCB cases, also did subsequently author the Eldorado opinion, which we cite to in support. Can it be rationalized? Can it be harmonized? Well, I think that what Judge Roby was speaking of in the SWRCB, he was making a sort of side remark on the interpretation of 11-460, but that reasoning in that case was dicta. The SWRCB cases actually turned on the fact that the plaintiff in that particular claim could not rely on the area of origin provision at all to assert a priority right, because both parties in that case were using water from the same watershed. Basically, Judge Roby was considering a claim against the State board in that case in SWRCB cases over a term that was put in reclamation's permit, allowing reclamation to release water to meet salinity objectives.  Is that your position? They did not address the priority issue that we have here? That's correct, Your Honor. That Judge Roby's remark in SWRCB cases was dicta and was not at all critical to the reasoning of that case, because in that case, both parties could theoretically assert the area of origin. Both parties were in the same watershed. I think it seems to be pretty clear that what his position is nonetheless, does it not? No, Your Honor. Respectfully, I disagree. The Eldorado opinion, which followed the SWRCB cases, that case made clear that Section 11460 applies to the initial diversion of water, but that it does not extend to water that the reclamation project has properly diverted to storage at an earlier date. And this is an important distinction, I think, that my opponent, I think, overlooks, is the fact that we're talking about two types of water here. What 11460 protects, if a user within the watershed of origin perfects that, right? It protects their right to the initial diversion of water, to appropriate water that's natural flow water presently in the stream. That priority right does not apply to water that is actually reclamation's water, that water that reclamation has appropriated pursuant to its state issue permits, stored using reclamation's facilities and CVP facilities, and then later released, for example, during times of drought and water storage. And Eldorado and Phelps make clear that the area of origin priority applies to the first, to the appropriation of water that's natural flow, not to project water that has been appropriately diverted to storage at an earlier date. And, Your Honor, in addition to these two court of appeal cases that I think clearly support our position, there's also, as Judge Trott mentioned earlier, the opinion of the Attorney General, who clearly stated that in considering the constitutionality of the way 11460 was being applied to reclamation's water permits, the Attorney General's opinion stated that, yes, this is, you know, we recognize this area of origin priority, but this is something that has to be perfected in accordance with State law, both procedurally and substantively. In other words, this right doesn't exist by nature of 11460 alone, but these users have to go and apply for an appropriate appropriate permit from the State. So the absence of a permit is the telltale issue here, in your opinion? It is one critical component, yes, Your Honor. And I think that the other component of what we're saying here is that even if, to Hama-Calusa, were to obtain a permit according to the reasoning of Eldorado and of Phelps, that permit would – that appropriate permit would enable it to take natural flow water. But what, to Hama-Calusa's members, they're seeking is water that reclamation manages through multiyear complex calculations to account for projections of drought and shortages and a whole host of other considerations, and not just wildlife considerations. And this is a complex system that reclamation manages, and that it manages in accordance with what the 1950 Act, which authorizes the Sacramento Valley projects, stated. In that Act, Section 4, Congress stated that these canals should be coordinated and integrated with the operation of the existing features of the CVP in such a manner as will effectuate the fullest and most economic utilization for the widest possible public benefit. Am I hearing you saying that even if they get – if they apply and get a permit, they're not going to get anything? Is that what I'm hearing you saying? No, Your Honor, not exactly. I think that – I would not want to speculate. Not exactly? No, Your Honor. I would not want to speculate the conditions under which the State Water Resources Board would be adjudicating these rights in terms of whether there's sufficient water for appropriation and then how that would affect reclamation's rights. But what I am saying, Your Honor, is that what Tehama is seeking is to have priority rights as an area of origin user to water that the project, that reclamation, has already diverted according to its State issue permits and stored and later released. And the Eldorado and Phelps case, again, are instructive in showing that the area of origin priority applies not to the project water. So what do they get? Nothing. Your Honor, again, I wouldn't want to speculate, but I – Well, but it sounds that – it sounds that that's what you're saying. So they have their permit, but guess what? They're stuck behind all of these other problems. No, Your Honor. Reclamation recognizes the area of origin priority, and it applies that by – Term 22 in reclamation's permits, in fact, applies the area of origin provision by making reclamation's initial diversion of water subject. It makes reclamation's rights to appropriate water junior to the rights of appropriators within the area of origin. So what that means is that the State Water Resources Control Board, in their adjudicatory hearings to determine these different permit rights, I think would likely be looking at the amount of water available at the natural flow stream and recognizing that as a watershed origin user, then under Term 22 and under the decision of the board in that case, D-990, which we cite on our brief, the area of origin would afford a priority in terms of appropriation of water. I guess you're a little confused, and maybe you can clarify it. I may be sticking my neck out here. I don't really have a good feel for the correlation between permit rights, so to speak, and those that, you know, are not reliant upon permits. Are you saying that just getting a permit then gives you the area of origin rights that you otherwise would not have? If I understand Your Honor's question correctly, yes. As the Attorney General's opinion states, the way in which an area of origin user is to perfect and to assert his right to the protection offered by Section 11-460 is to apply for that State Water right in accordance with State Water law, and State Water law sets forth the procedure with which this is done, and it is through a permit that's issued for appropriation of water from the State Water Resources Control Board. Where does that come from in terms of the statutory language that talks about priority of rights? I just don't understand the nexus of the interaction between that language and this whole permit process. Well, for permittees, sort of the general class of contract of water users, the general role of appropriation of water is under State law sort of first in time, first in right, that if you apply first, you get priority. However, the way Section 11-460 modifies that and protects area of origin users is to say that if the user making that application seeks to divert water that's already present in the stream for use within the watershed, then his application and his right to divert that for the rights of others who are seeking to divert that water outside the watershed in so far as those rights are perfected, even if that right is, even if the watershed user's right is later in time. So how does this work out with somebody who does have a permit compared to those that are riparian owners, so to speak? I mean, how does this priority then shake out as a practical matter between those two different classes, so to speak? Well, Your Honor, the way in which this has played out in the context of CBP water is actually more complex than just two classes of holders there. So there are exchange contractors who held pre-1914 riparian appropriative rights, and they sort of have both rights to natural flow water and to project water. And that was part of sort of a deal that was ---- I understand that, but what about new permit holders? I mean, how does that play out? I guess I'm not clear about this. The real world, what does that mean? Again, Your Honor, I ---- They're all on the same footing, so to speak, as soon as you get a permit? No, Your Honor, because the permit itself sets conditions that state when you are allowed to divert water for what uses. And so an area of origin user would get priority over appropriators who are seeking to export that water out of the origin. And all of this is incorporated in Term 22 and 23 of reclamation's permits, which make ---- Is there some entity civilly situated to the other side that has applied and has a permit? Is there some analog we can look to to see what happens here? Maybe the other side can help us with that, too. I mean, is there anybody who has done what you say has to be done, similarly situated to the other side, applied for a permit, now has one, and then we could take a look at that and see how they ---- what they get? Your Honor, I'm not ---- I don't know that I can answer your question. I think Mr. O'Hanlon may be able to, as representing south of Delta contractors. Yeah. You see, on one hand, you seem to be saying, and I'm not criticizing you, hey, get a permit. And on the other hand, it's, yeah, but a permit doesn't get you very much. Well, what the permit gets and what the permit guarantees is what's protected under 11-460, Your Honor, which is the right to appropriate that water in the first instance. And, I mean, I think that we have to look at this in the context of the entire operation of the Central Valley Project, which is, you know, California authorized this legislation in the 1930s, couldn't pay for it, and so Congress had to authorize legislation as part of this sort of bargain, understood that it was putting all of this capital investment into a system that is supposed to benefit users throughout the region, throughout the country, and not to afford priority in terms of water delivery contracts. How hard is it to get a permit? I mean, you know, I'm not familiar with that process, but I assume that the government has a lot of discretion in denying the application. I mean, what standards are utilized? Well, I believe the State Water Resources Control Board is the one that would be administering these permits. And under state discretion as to whether to grant one or not grant one, are there any standards at all? They do, Your Honor, but that discretion is reviewable in state court. Does it take years and millions of dollars? I mean, the other side says, you're throwing us to the lions and we'll never survive in one piece. I mean, do you know anything about how this process plays out? I mean, it sounds easy. You know, you can put it in a sentence, get a permit, and then it's like everything else, the devil is in the details, and you go and see what that's all about. And they say, for what purpose should we get this permit? We're not sure we can get it. It's going to cost millions of dollars. It's going to take forever. We have to build our own systems. Is that true? Your Honor, I can't, yes, Your Honor, I can't, that's correct. I can't speak to sort of all of this. That's, it's not in the record in terms of the cost and the procedure. But I think what I can speak to is that all of the legislative, the legislative history in the state court cases all demonstrate that, I mean, these are complex water rights that are being apportioned, and that reclamation has to be considering multi-year, multi-use purposes. And those are terms that are written into these contracts that, say, Himakalusa's members signed and that other CBP water contractors signed. And I guess your argument would be, even though they might not get very much, that's not my fault, that's not our fault, because that's, that's what they get, the lawsuits, right? It is, that's, it is correct that it is a term of their contract and that it is, unfortunately, the reality that this reclamation has to deal with, is that, you know, in times of water shortage, in times of drought, there's limited water to be apportioned, and that's why these terms, for example, Article 12 in the contracts are incorporated to show that, look, you know, you're signing these contracts and we will do the best we can, but. Shortages is a different question. Did you intend to save some time for your comment? I did, Your Honor. All right. Thank you. May it please the Court, my name is Daniel O'Hanlon. I represent the CBP contractors who are located south of the Delta, the so-called export areas. These are the contractors who would lose CBP water supply if Tehama were granted the relief it seeks in this case. I'd like to, if I can, briefly address Judge Block, your question about how does this work in terms of rights among appropriators. The rights of appropriators on a stream are determined in reference to priority. So the first appropriator would have the strongest right, and later appropriators would then be junior to them. They're all diverting from the same stream. As the water declines in the stream, and there's less water, those more junior appropriators would then lose their right to continue to divert, because there would no longer be water available for them to use. Folks are okay, but what about these folks? I mean, what remedy, if any, do they have? They're faced with this horrific problem. Obviously, you know, mother nature created it all, but do they have any rights whatsoever? How do they remedy their problems? Well, where they are today is they have a very valuable right under their CBP contract. And they suffer shortages, but in fact, my clients suffer even worse and more frequent shortages. Speaking to what are their rights under 11-460, what right do they have to go make a water rights application? Again, they have a very valuable right there. They basically get to step ahead of the priority of the Central Valley Project. So when they go make their water rights application, if they do, all the water that is currently being appropriated by the CBP would not count. In other words, that water would be deemed available for diversion by a new appropriator. And in fact, there are new permits being granted in the Sacramento Valley watershed that are exercised that way. They take out the water that the CBP is appropriating, and that water is deemed available for a new appropriator. So there are people similarly situated to the other side? Yes, there are new diverters, people seeking new water rights applications in the Sacramento Valley watershed who are being granted permits. They're taking millions of dollars and endless years and? It varies, of course, with the size of the diversion and the size of the project and so forth. Have you ever been involved in seeking one of those permits? Yes, Your Honor. How long does it take and what does it cost? It is slow. Slow? What does slow mean? Here we go. What does discreet mean? What does slow mean? It could be years. That's true. But none of this is a consequence of anything that the Central Valley Project or the Bureau of Reclamation is doing. And here, really, this case can be decided based on the terms of these contracts, which do include shortage provisions. Well, the opposing counsel says that those contracts, validation of those contracts and consideration of those contract terms should not be considered in resolving this case. And you say you disagree with that because? I absolutely agree with that because they are bound by the terms of their contract. Do you agree or disagree? I agree. He said it should not be considered in deciding this case. I disagree. Because? Because they are bound by the terms of their contract. But he says the contract doesn't address at all. The obligations under State law. That it's a contractual matter separate and apart for the obligations under the statute. The contract specifically addresses the circumstance here where there is a shortage, not enough water to distribute to all the contractors. And under those circumstances, it says, and they agreed, that Reclamation shall apportion the water supply. But his argument is that the contract is inconsistent with the obligations of State law to which the Bureau has agreed that it's bound. Two responses. Of course, we disagree with his interpretation of what 11-460 means and requires. And secondly, even if you accept the dictum, and it is dictum in the State Water Resources Control Board case that someone in the area of origin can go get CVP water by seeking a contract, well, here they have a contract. And the terms of that contract specifically provide that in terms of shortage, Reclamation can apportion. And that's what it did in 2008 and 2009. Sotomayor, the contract trumps State law if State law be interpreted in any consistent way. Even if you accept that dictum, which is I – it's, again, it's very sparse. It's a few sentences. It says they can seek a contract. Here this contract doesn't provide the right they seek. So even if you interpret State law in accordance with that decision, here the contract that they obtained in 2005 does not grant any area of origin preference. So your argument is it would be consistent with the dictum because the dictum merely said that they can seek a contract. They sought a contract, but the contract doesn't contain provisions that they now seek to assert. Yes, Your Honor. But ordinarily you read State law into a contract, and I hear them saying we'd do better in a short – in shortage time if we had this – if we had this ability than we do now. Well, that is a rule of construction, not a rule of interpretation. In other words, a legal – What's the difference between construction and interpretation? The legal effect versus the party's intent. So when a contract is unclear, a court will look to give it a legal effect. But, however, the law is also clear that a court won't do that where it contradicts the intent expressed by the parties in their contract. And here Article 12c is clear. Reclamation has the ability to apportion the water supply. So, but opposing counsel says the intent of the parties comes into play only if the contract is ambiguous. Well, I disagree with that. I think the intent of the parties is expressed in the words of the contract. All right. Thank you. Thank you, Your Honor. We'll give you one minute for rebuttal. The only mechanism, Your Honor, is to get CVP water is a contract. And that is the teaching of the Eldorado and Phelps decisions. I want to say that first. Secondly, the history of 11-460 makes unmistakably clear that this water has to be delivered upon request and payment to those within the area of water where the water originates before it can be exported. Term 23 of the permits that the State Board granted to reclamation for the CVP says the export of stored water outside the watershed of the Sacramento River Basin shall be subject to the reasonable and beneficial use of said water within said watershed. Counsel, if we agree with you, how could the Bureau plan the distribution of water? Because there would be no, I mean, you could walk in one day and give them payment and then everything would have to be re-scrambled. There's no form. There's nothing to guide any timelines or any order to what you're proposing. Well, once again, Your Honor, there is a congressionally enacted mechanism for delivering water supply to the D.C. contractors. And that's the water they get. And they only get the water that can be conveyed by that system. And so that's all that's an issue here. This is not a situation where somebody can just one day walk into reclamation and say give me a contract. That's what you said. If you gave payment to reclamation, at that point reclamation would be obligated to give the water to your clients that ordinarily would be going south. Under the circumstances of this case, because the reclamation is bound by the 1950 Sacramento Canals Act to deliver water to this area if those in the area will pay for it. If the distribution of CDP water within the Sacramento Valley is to be expanded, that's basically within the purview of Congress to enact new legislation, to build new facilities, to extend the reach and distribution of that supply. As matters stand, the water supply that goes to the D.C. contractors is fixed. It's fixed by the Sacramento Canals Act and by their contracts. And so this is not a situation where chaos ensues because this Court rules that Section 11-460 applies to the CDP. It is simply a matter of continuing with the contracts that are in place, but delivering all of the contract supplies to the other. No shortages, in other words. Now, I want to be careful with that because there can be shortages, but not in order to export supplies to the San Joaquin Valley. There are all sorts of regulations, the ES, the Endangered Species Act, NEPA, California regulation, what have you, physical problems with the system that might develop. But what I hear you saying is that if you get the benefit of 11-460 in shortage situations, you do better than you do now. That's correct. We do better than we do. At the expense of the users south of the. Right, outside. And that is correct, Your Honor, except I want to emphasize that that expense is a tiny fraction of the water that's under contract to those contractors. Got it. We understand your argument. Thank you to both counsel, to all counsel. The case just argued is submitted for decision by the Court. Thank you, Your Honor. We'll be at recess for 10 minutes. Thank you, Your Honor.
judges: Block, Trott, Rawlinson